Good morning, Your Honor. Erika Hashimoto from the Georgetown Law Center's Appellate Litigation Clinic. Court-appointed counsel for Mr. Ammon Sumrall. With the Court's permission, third-year law student Yuli Dai-Chi will present argument on behalf of Mr. Sumrall. Good morning, Your Honors, and may it please the Court. The Georgia Department of Corrections and Wilcox officials arbitrarily denied Mr. Sumrall's religious diet. They ignored a long history of sincere faith and a well-documented need for a religious diet within the Georgia prison system. Because they have forced Mr. Sumrall to choose between his God and his sustenance, they have violated both Constitution and RLUIPA. Allow me to begin with the issue of religious sincerity, which goes to the heart of this case. Mr. Sumrall has had an unchanged religious affiliation since the 1990s. He has been enrolled in the AAP, documenting his need for a religious diet since 2007. Most importantly, the record never shows Mr. Sumrall consuming any items that would violate his professed religious beliefs. Instead, all of the purchases that Mr. Sumrall has made at the commissary, relied on by the government to deny or legitimize the denial of his religious diet, are explained by both Mr. Sumrall's affidavit and his deposition. He either traded these items with other prisoners by participating in the bartering economy, or he would sometimes separate the vegan elements of these items where possible to supplement his diet. This is a qualified immunity inquiry that we have to satisfy. My concern is whether there are any cases that would clearly establish that prison officials violate the free exercise clause when they determine that an inmate's veganism is insincere based on his significant purchases of non-vegan food items, particularly when he could still purchase items from the store and pick around the non-vegan food from his plate like he had done in years past. I know that the clearly established test for purposes of qualified immunity is not always popular with everyone, but it is nevertheless part of the governing law. What do you say about that and how that could be satisfied here? I think your question raises a few points, Your Honor, so I'll try to take them in turn. As to the extent that your question is asking whether there is a case that is on all fours here, there is not, but there is certainly enough case law in the Eleventh Circuit that clearly establishes a sincerely religious prisoner's right to a religious diet. It started as early as at Martinelli, where this court demanded that a religious prisoner was afforded the opportunity to pick food that complied with his religion. I don't doubt that, but a prisoner could abuse the system, and prison officials, you would concede that, right? Absolutely, Your Honor. A prisoner could reasonably decide that a prisoner, an inmate, has abused it, that the belief is insincere. What do we do with that here? So, of course, that point is taken, Your Honor, but that does not mean that prison officials have unfettered discretion to completely decide the sincerity of a religious prisoner on their own. In cases such as these where there is a dispute of fact regarding the sincerity of a prisoner's belief, that dispute cannot be resolved at a summary judgment standard. It is for the trier of fact. Here, there is enough evidence that has been introduced in the record to support a genuine material dispute about the issue of Mr. Sumrall's sincerity, and that dispute affects both prongs of the qualified immunity. When trying to determine what law is clearly established, there is a vast difference between law that clearly established a sincerely religious prisoner's right to a religious diet and that for insincere prisoners and what that goes. But as long as that dispute exists, neither question or neither prong of the qualified immunity can be resolved at this stage or to the extent that this Court resolves them. It must be resolved in Mr. Sumrall's favor as a nonmoving party. Sincerity remains, based on this record, a disputed fact. Wilcox officials point to his commissary purchases. Mr. Sumrall points to his longstanding history, to his explanation of those purchases, which is perfectly compliant with his religion. He points to the fact that he's been on this diet since 2007, the many complaints he has filed in the Georgia prison system about the qualities of his food being non-vegan, the fact that he would sometimes find dairy or meat essentially being forced to violate his religion based on these purchases. And I think this Court has, again, a revered history of confirming that religious prisoners with sincere beliefs have a right to a religious diet. And that when prison officials ignore that right, I think that there is enough room for this Court to, again, affirm that principle that has been a longstanding thing of this Court. What about the fact that he apparently is on and has been on a vegan diet plan for a lengthy amount of time now? Why doesn't that make his claims related to that part of it moot? Yes, Your Honor, I believe your question goes to the RLUIPA claim, which has been interpreted for injunctive relief, but it does not relate to the First Amendment. So to that point, I would say the voluntary cessation doctrine counsels against mootness here. There's a few factors that I think this Court has taken into consideration in the past to deny the government the presumption that their illegal behavior will not continue in the future. For example, I think the process in which the religious diet is managed seems sort of a black box. There's no way to determine why Mr. Sumerl is put back on the diet, why he's taken off the diet. And that should concern the Court. In addition, I could also point to their legal positions here before the Court. On the RLUIPA claim, they say, we promise we will not violate Mr. Sumerl's religious rights again in the future. But then on the identical First Amendment claim about past behavior, they say that he's actually not sincere, so they can do whatever they want with his diet. That should concern the Court. These inconsistent positions, I think, raise enough doubt that the moment that the Court looks the other way, Wilcox officials will resume their illegal behavior, as well as the Georgia Department of Corrections. And therefore, under the Voluntary Cessation Doctrine, I think that would counsel against finding mootness on the RLUIPA issue. Do you agree, returning to the earlier issue, that prison officials are allowed to inquire into the authenticity of an inmate's claimed beliefs? Absolutely, Your Honor. I think Cutter v. Wilkinson makes that quite clear, but I think there's enough evidence to support that that right or that ability to determine or to inquire into a prisoner's religious beliefs is not immunized from review. It needs to be reasonable. It needs to be considered based on all of the facts of the record. And, again, pointing back to Mr. Sumerl's long history of beliefs, pointing back to his behavior that is completely compliant with his religion, I think the record shows that there's a clear dispute here. That should not be resolved under the summary judgment standard. The reasonability of the determination that Wilcox officials made should be subject to review. Otherwise, we would essentially be putting every prisoner and every person's First Amendment right in the hands of the government and the evidence that the government avails itself to. And I think that would be a dangerous path that, again, this Court has rejected based on its longstanding history of confirming a sincerely religious prisoner's right to a religious diet. With Your Honor's permission, I would like to discuss the Equal Protection Claim, unless there's anything else. Wonderful. So on the Equal Protection Claim, the thrust of our argument today is that Mr. Zwickla is a similarly situated comparator. The record contains an affidavit showing that a Jewish white inmate who engaged in the exact same conduct as Mr. Sumerl received more favorable treatment. Mr. Zwickla's affidavit, which is Document 45-7, Your Honors, confirms that Mr. Zwickla purchased and continues to purchase non-vegan items from the commissary and yet was allowed to remain on the AAP by Wilcox officials, unlike Mr. Sumerl, who was removed. I think for purposes of the first step of an Equal Protection Claim, that satisfies the similarly situated comparator analysis and therefore should be allowed to move forward to a trial and be remanded for the jury to inquire into whether there was any intent to, I guess, engage in invidious discrimination. Remind me whether there are any differences in the policies at the relevant times. So at the time that both Mr. Zwickla and Mr. Sumerl alleged or their affidavits contained, no, Your Honor, there was only one policy which said that – which did not contain the prohibition of non-vegan purchases for anyone. Wilcox officials and the Wilcox prison only has one religious diet for everybody. Everybody is subject to the same conditions. So by that metric, by that standard, if it was truly a condition to remain on the religious diet that you must not purchase non-vegan items, Mr. Zwickla's allegations show that he received preferential treatment. And the only thing that explains it at this stage of litigation is the difference in race and religion. Just to be clear, I thought that there were two versions of the vegan diet, vegan and super vegan. Do you characterize those as the same religious diet? No, Your Honor. There are two versions of the same diet, but there's only one type of diet at a time. So Wilcox prison had the exact same diet until 2022 and then changed to a new diet. But at the time of Mr. Sumerl's allegation, both him and Mr. Zwickla were engaged in the exact – were members of the exact same part of the diet. Mr. Zwickla's purchase was nearly a year after Sumerl was removed from the AEP list the first time. Does that make it – does that make him not really comparable? It does not, Your Honor, for one reason. The receipt that is attached to Mr. Zwickla's affidavit is only an example of his purchases. I think the receipt shows the date of August 18, 2020, which is – There's no testimony that he made a purchase at the same time. Well, in his affidavit, I would point to the sentence where Mr. Zwickla said that we, referring to himself and other Jewish white prisoners, purchased and continue to purchase, meaning that his actions range both past and present. And I also want to characterize that it was – his affidavit and the examples of his purchases don't date back one year. They're both at the same time, 2020, July 2020, which is the timeframe where Mr. Sumerl's complaint is lodged against them. So the receipt he attached was from August 19, 2020, right? Yes, Your Honor. And Mr. Sumerl was removed on July 30, 2020, for 30 days until he was reinstated on October 19, 2020. So as – I think for – I thought the second removal was actually two months earlier. It is not, Your Honor. I think the record shows – and you can find that in the interrogatories of the Wilcox officials, which is document 41-3. You can find Mr. Sumerl's affidavit 31-3, his removal from the AAP. It was from July 30, 2020, or July 28, 2020, until October 19, 2020, a period ranging to almost three months. I see that my time is up, but thank you for your time. Thank you. Good morning, and may it please the Court. I'm Ellen Cusimano on behalf of the Georgia Department of Corrections, as well as the prison officials in this case. Unless the Court would prefer otherwise, I did want to briefly address the issue of discretionary authority for the qualified immunity analysis. I think the key to that analysis is that you really have to assume that what the prison officials did was correct and valid and legitimate, and they did everything properly. And then ask the question, were their actions reasonably related to the outer perimeter of their job duties? Why do we assume that first? Why do we make the assumption, Ellen, in your first point? Well, there's case law saying that in this analysis, you have to strip away the constitutional taint and strip away the wrongdoing and then focus on what's left. And here, when we look at what the prison officials did, they are the warden and deputy warden of the prison. They're the top prison administrators. They are responsible for providing meals to inmates and accommodating religious beliefs. And so making decisions about who is on the program and what meals they receive, that's very much within the outer perimeter of their job duties. In fact, I would say it's within the core of their job duties. Now, Mr. Sumrall relies very heavily on the Davenport case. And I want to talk not about Davenport, but about a case that this Court, a different panel of this Court, decided about three weeks ago. It's a discretionary authority case called Donald v. Norris. And this citation is 131 F. 4th 1255. And in that case, a detainee at a jail had a heart attack. And the jail administrator released him from jail early and drove him to the hospital instead of calling an ambulance. And this Court determined that the administrator was acting within his discretionary authority. And in reaching that conclusion, this Court limited and cabined Davenport to a very specific situation, which is when there is a state law that defines who has the authority to make a certain decision. And so in Donald, there was no state law defining who has authority to release a detainee early from jail. Actually, speaking only for myself, I don't doubt that these officials had the authority to make this determination. I don't think that that solves whether it was correct. And also, you've not cited this case before to us. Am I correct about that? That's correct. It came out about three weeks ago. I'm concerned that the other side hasn't had a chance to look and consider that case. Yes. So we probably shouldn't discuss it. Okay, I understand. Okay, I will move on then. But I did at least want to bring that case to the Court's attention. The 28-J letter on new authority, which you could have done before we came here today, but that also would give your adversary an opportunity to respond. Yes, I understand. I will move on to the constitutional claims then, beginning with the free exercise claim. I want to make it clear that we're not Back on that. I'm fully on board personally with the fact that they had the authority to make this decision. I don't know that that shows that they are exercising their authority in a proper manner. And I think opposing counsel made some arguments about why we can't be certain that they will exercise that authority and make a decision about the diet, since we don't really know what standards are being applied. Could you respond to that point? So I guess that goes to the RULIPA claim and what might happen in the future. Okay, so moving on to the mootness issue, I think first we have to look at what exactly did Mr. Sumrall request in terms of injunctive relief. And his complaint and amendment complaint don't specify that. They just say that he wants an injunction. But in his deposition, he did explain what he wanted. And he said that he wanted, quote, to be put back on the vegan AEP meals. And he has been put back on those meal plans since October of 2020. Now as far as the voluntary Yes. Yes. And so as far as the voluntary cessation doctrine goes, I'm actually not sure that that doctrine even applies here. And here's why. Really the purpose of that doctrine is to say that a defendant can't unilaterally change their conduct after suit has been filed in an effort to manipulate jurisdiction. And that's not the situation we have here. Because he was placed back onto the program in October of 2020. He then filed It was after the filing of grievance, right? I'm sorry. It was after the filing of his grievance, is that right? Well, he The filing of the grievance is what kind of prompted the prison officials to look at his commissary. Yes. He filed a grievance. They looked at it. He put him back on the list. That's correct. He sued later. He sued about eight months later. So in other words, this isn't a situation where he filed a lawsuit and then the Department of Corrections decided to put him back on the program in order to, you know, to moot out the case. And because of that, there really isn't much of a danger that this was meant to manipulate jurisdiction, which is really what the voluntary cessation doctrine is meant to address. I don't think that That shows actually the grievance process working the way it's supposed to work, which is an inmate raising a concern and having that concern addressed without litigation. Am I correct on that? No. Again, the grievance that Are you kidding me? Is she not correct about that? I'm sorry. I wanted He filed a grievance. Yes. The prison officials looked at it. Yes. You know what? I see his point. We're going to put him back on the list. My point is that shows that the grievance process worked in a way that it's supposed to prevent litigation. Your Honor, if I may, I think maybe there's He filed the grievance complaining about the vegan meals and because of that, they looked at his commissary purchases and they removed him from the program. It's not until he did not get re-enrolled in the program because of a grievance. Instead, he went to the chaplain and spoke to the chaplain and the chaplain put him back on. And at that time, he had also stopped making purchases of non-vegan food. So I'm sorry. I want to clarify the facts there. Will he go back on the diet before or after he filed the lawsuit? Before. Eight months before he filed this lawsuit. He was placed back on the vegan diet. Correct. He was placed back on the vegan diet in October of 2020 and then he filed this lawsuit in, I believe it was either June or July of 2021. So there's an eight-month difference there. And so that's why I believe that voluntary cessation doctrine just doesn't apply here. I also want to point out the fact that he was not arbitrarily removed from the program. He was removed for purchasing hundreds of non-vegan products. And he stated in his deposition in this case Do you have a legal protection argument in that regard? I'm sorry? Do you have a legal protection argument in that regard? Yes, absolutely. I think Do you think that Switla is a similarly situated comparator? Sure. That is really the only person he's identified as a comparator. And here's why. Does he identify anybody else? The case was not clear on exactly how many comparators you have to identify. But here's why I don't think they were similarly situated. Mr. Switla, we know that he purchased non-vegan items from the commissary in August of 2020. But the culling of the list happened a month prior in July 2020. So really what we need from Mr. Switla is evidence that he purchased non-vegan foods during the same period as Mr. Sumrall, which was May to July of 2020. And we don't have that evidence in the record. Do you think the 30 or so days would make? I'm sorry. Can you repeat the question? Do you think the 30 or so days would make? I'm not understanding the argument that you're making regarding the timing because it was fairly close in time that we're talking about here. So you're trying to draw a distinction. I don't understand the distinction you're trying to draw. Sure. Well, the prison officials here, they culled the list by looking at Mr. Sumrall's purchases from a specific time period. And then they made that decision in July. After July, they did not do any more culling of the list. So the fact that Mr. Switla then bought non-vegan products after the culling happened, the prison officials wouldn't have even seen that he had bought non-vegan products at that point. When you say they culled the list, do you mean that they did that just for Mr. Sumrall or that they ran a comparison for all inmates who had requested the vegan diet and determined which of those had been purchasing non-vegan products? The affidavit from Warden Singleton says that they removed other inmates from the list for the same reason that they had bought non-vegan products from the commissary. And so for that reason, I don't think Mr. Switla is a comparator here. I know there is a statement in his affidavit that contains past tense language saying that he purchased non-vegan products in the past, but we don't know when in the past. That could have been five years ago, one year ago. What matters is did he purchase it in that time period, and we just don't have that evidence. I'm not pleased with what the record shows about this culling process is not currently a policy at the prison, right? Correct, but the current policy does say that inmates can be removed if they purchase non-vegan products from the commissary. How or when that would be determined, right? That's correct. And should that give Mr. Sumrall any concern that some sort of future purchases of non-vegan items could lead the department to take him off of the vegan list again? No, and here's why. He testified in his deposition that he is no longer purchasing non-vegan products from the commissary and that he has no desire to do so. So in other words, the actions that led him to being removed in the first place, he's no longer engaging in those actions, which I believe is another reason why his rule of acclaim is moot. What's your response to, and then we'll let you move on to anything else you want to, but to his argument that we can't be sure that he won't be taken off when the department is contesting that it was any kind of violation to do so in the first place? I think the reason, I mean, we're not contesting that it was a violation because we believe that prison officials can reasonably question the sincerity of an inmate's beliefs. And he has now changed his conduct so that he's not purchasing vegan food. And again, he has been on the program since October 2020. He's remained on that program for many years, even though he's filed grievances about some of the meals that he's received since then. This is just, this is not a situation where after this litigation ends, the department is going to remove him again. They recognize that he has changed his behavior and that he belongs on this food program. Whether they recognize it or not, he says he has changed his behavior and has no intention to return to the behavior that led to his removal. And in the absence of that, it's hard to see how there's any kind of imminent injury. That's correct. Unless this Court has any other questions, I'm going to turn it back over to my colleague. Thank you. Okay, thank you. Thank you, Your Honors. On rebuttal, I would like to address a few points raised by your questions. First, on the voluntary cessation doctrine, this Court has never held that the voluntary cessation doctrine is inapplicable when the challenged behavior ceases before a lawsuit is filed. It is simply a factor considered into the analysis of whether voluntary cessation doctrine applies. I would respectfully disagree, Your Honor. Mr. Surma's testimony does say that, but I want to emphasize that he has changed or comported his behavior to the requirements because he now knows what they are, because the prison regulation now prohibits purchase of non-vegan items. Back then, it did not. And I think the fear here, based on how this process works, which is truly unexplainable, is that, you know, Wilcox officials or the Georgia prison system may use some other unannounced factor to simply deprive him of his diet in the future. I think my colleague mentioned that he was put back... It's too speculative. I don't know what this would be. It's one thing to say, look, I fear that they will wrongly understand my purchase of a non-vegan food item and remove me wrongly from the list again, but he's not doing that anymore, so... I think the fear stands in both the fact that the condition was then non-announced, now it is, so he can comport, but also the way that the process works is unexplainable. My colleague mentioned that Mr. Sumer was put back on the diet because he talked to the chaplain. That's nowhere in the procedures. And I think there's a fear that his RLUIPA rights might depend on whether he's able to find the chaplain that day, and that counsels against the voluntary cessation doctrine. Moving on to the equal protection, Your Honor, I think you raised the point about Mr. Ticklev being the only similarly situated comparator. I would respectfully like to address that, because the record shows that there are more numbers on both sides of that equation. Mr. Ticklev doesn't just speak for himself in his affidavit, but also other white Jewish inmates that he has observed making the same purchases as him and Mr. Sumer who are allowed to remain on the diet. And then there's also another black non-Jewish prisoner, Mr. America. I believe his affidavit is 45-8, who says, I was removed from the diet at the same time as Mr. Sumer for purchasing non-vegan items at the commissary. No, Your Honor, because, again, I would certainly not concede that Mr. Ticklev's affidavit limits all of his purchases only to that one date in August. I think what was missing here is that the summary judgment standard counsels for all favorable inferences to be made in Mr. Sumer's favor and not the other way around. No, I was referring to the... I understand your point on that one. I was referring to the other inmate who said that he was removed at the same time. Yes, but he shares the same qualities under the equal protection, both race and religion, with Mr. Sumer. So that would show that, you know, the decisions are being made on the basis of certain racial groups being given preference on whether they are allowed to remain on the diet or not. Your Honors, if there are no further questions, thank you. It's been a privilege. Well, thank you, Mr. Daichi. I hope that you will come back someday as a member of the Bar, but I'll tell you, you did a really fine job this morning, and there are some members of the Bar who haven't done as well. So congratulations and good luck with the rest of your career, and thank you, Professor Hashimoto, for the assistance that your clinic regularly provides us. Thank you as well, Ms. Cusimano. We're going to move to our third case. Thank you. Thank you.